[No. B203121. Second Dist., Div. Three. Oct. 9, 2009.]

GREAT AMERICAN INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ANGELES CHEMICAL COMPANY, INC., et al., Real Parties in Interest.

COUNSEL

Duane Morris, Yvette D. Roland, Katherine L. Nichols and William J. Baron for Petitioner.

No appearance for Respondent.

Caufield & James, Jeffery L. Caufield and Ken E. James for Real Parties in Interest.

Law Offices of Timothy C. Cronin, Timothy C. Cronin and Peter D. Nitschke for Real Parties in Interest Robert Berg, Donna Berg, Pearl Rosenthal and the Estate of Arnold Rosenthal.

OPINION

**CROSKEY, J.**—When a liability insurer providing a defense to its insured believes there is no longer a potential for coverage and, therefore, it is no longer required to defend, it may bring a declaratory relief action to obtain a judicial declaration that it need no longer do so. The insured, however, may seek to stay the insurer's declaratory relief action if proceeding on that action could prejudice its defense of the underlying liability action. In this case, we consider the circumstances in which the trial court must grant a stay, and when the court may exercise its discretion on the issue.

Petitioner Great American Insurance Company (Great American) insured Angeles Chemical Company, Inc. (Angeles), and its officers and directors. Angeles and a neighboring property owner, McKesson Corporation (McKesson), sued each other for cleanup costs relating to environmental contamination of the groundwater beneath both sites. The complaints also named officers and directors of each company. Various cross-complaints were filed; the subsequent owner of the Angeles site sued some, but not all, of the Angeles owners and directors; those owners and directors sued Angeles.

Great American settled the lawsuits filed against its insureds by McKesson and McKesson-related individuals, leaving actions *among* the Angeles-related parties still pending. Great American then brought the instant declaratory relief action, seeking a declaration that those settlements had exhausted its policy limits and that it was therefore no longer obligated to defend its insureds in the still-pending litigation. The insureds sought a stay of the

declaratory relief action, on the basis that resolution of the issues raised in the declaratory relief action would prejudice it in the still-pending underlying litigation. The trial court agreed and granted the stay. Great American sought relief by a petition for writ of mandate. We issued an order to show cause and, for the reasons stated below, now grant that petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Parties and the Property

From 1976 to 2001, Angeles operated a chemical repackaging plant on its property (the Angeles site). The Angeles site was not originally owned by Angeles; instead, in 1975, it was leased[1] to Angeles by John & Janyce Locke (the Lockes), Robert and Donna Berg (the Bergs), and Pearl and Arnold Rosenthal (the Rosenthals).[2] In 1994, the Lockes, Bergs, and Rosenthals transferred the property outright to Angeles. In addition to initially owning the property, the Lockes, Bergs, and Rosenthals were all officers of Angeles. As will become apparent, there is now a schism between Angeles and the Lockes on one side, and the Bergs and Rosenthals on the other. The Angeles site is no longer owned by Angeles. In 2001, Angeles sold the Angeles site to Greve Financial Services, Inc. (Greve). Greve appears to have aligned itself with Angeles and the Lockes against the Bergs and Rosenthals. Greve, Angeles and the Lockes are all represented by the same counsel.

Great American is one of many insurers that wrote policies covering Angeles. The policy at issue (the policy) identifies the policy period as November 1, 1976, through November 1, 1977—this latter date was later changed by interlineation to read January 1, 1978. Whether these additional two months of coverage constitute a second policy period or merely an extension of a single policy period is an issue which will be resolved in this declaratory relief action.

Under the policy, Great American covered not only Angeles, but "any executive officer thereof and the spouse of such executive officer, while acting within the scope of his duties as such." We therefore use "the insureds" to refer to Angeles, the Lockes, the Bergs, and the Rosenthals collectively; Greve is not an insured. The policy provides for an aggregate limit of $500,000; the language of the policy also provides, however, that the aggregate limit applies separately to property damage arising out of operations and "property damage for which liability is assumed by the named

---

[1] The copy of the lease in the record before us has been reduced in size so much as to be largely unreadable.

[2] Arnold Rosenthal is now deceased; references to "the Rosenthals" include the estate of Arnold Rosenthal.

insured under contracts covered by this policy." The nature and extent of the covered claims and whether the policy's aggregate limit has been reached are also issues to be resolved in this declaratory relief action.

Angeles had other insurance policies with other carriers, both primary and excess, which also provide coverage for the claims at issue. Angeles and the Lockes believe that there is an additional $32 million in coverage available, while the Bergs and Rosenthals state that the amount is in excess of $20 million. In our consideration of the issues, we will assume the more conservative figure.

Next to the Angeles site is the property owned by McKesson, which also operated a chemical repackaging facility on its property. The McKesson site is alleged to be owned by Harvey Sorkin, Seymour Moslin, Joseph Sorkin, and the Estate of Paul Maslin (the McKesson owners).

It is undisputed that there has been significant environmental contamination of both the Angeles site and the McKesson site, specifically affecting the groundwater beneath the sites. What is unknown is whether the contamination is due: (1) solely to activities on the Angeles site; (2) solely to activities on the McKesson site; or (3) a combination of activities on both sites.[3] The federal and state governments sought substantial cleanup costs for the contamination on both sites.

## 2. The Lawsuits

The initial complaint was filed in federal court by Angeles, Greve, and John Locke against McKesson and the McKesson owners. The operative pleading is the fourth amended complaint, which alleges 13 causes of action, including liability under CERCLA,[4] and related state law causes of action. The complaint also names the Bergs and Rosenthals as defendants. While the general allegations of the complaint seek a declaration that McKesson, the McKesson owners, the Bergs, and the Rosenthals are "jointly and severally

---

[3] There is also a suggestion that contaminated groundwater further upstream of both sites has contributed to the contamination on both the Angeles and McKesson sites.

[4] CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. (42 U.S.C. § 9607 et seq.) It "imposes liability without fault on present and former owners of hazardous waste disposal sites, transporters of hazardous wastes, and those who arrange for the transport and disposal of hazardous wastes." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 292 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

liable for the presence of hazardous substances contamination" at the McKesson site and the Angeles site, the only causes of action against the Bergs and Rosenthals are those alleged by Greve alone.[5]

This complaint resulted in a counterclaim by McKesson against Angeles, Greve, the Lockes, Bergs, and Rosenthals. The operative pleading was the fourth amended counterclaim. In it, McKesson alleged 12 causes of action, including liability under CERCLA, and related state causes of action. McKesson alleged that the Angeles site "is hydrogeologically upgradient of the McKesson [s]ite," and that chemicals released by Angeles's operations migrated from the Angeles site to the McKesson site. While McKesson's causes of action were concerned with the eventual contamination of the McKesson site, they relied on Angeles's initial contamination of its own site. The McKesson owners filed a separate counterclaim against Angeles, Greve and John Locke, based on the migration of chemicals from the Angeles site to the McKesson site.

As the Bergs and Rosenthals had been sued by McKesson for what appears to be Angeles's conduct,[6] the Bergs and Rosenthals filed cross-claims[7] against Angeles and also named Greve. Two of the causes of action, breach of contract and express indemnity, named only Angeles. Both causes of action were based on the lease of the Angeles site to Angeles by the Lockes, Bergs, and Rosenthals. The lease allegedly required Angeles, as lessee, to indemnify the lessors from claims arising out of Angeles's use of the premises, and to defend against such claims as well. The Bergs and Rosenthals alleged that Angeles breached the lease by failing to defend and indemnify them with respect to the cleanup costs sought by the government, and with respect to McKesson's action against them.[8] The Bergs and Rosenthals did not seek

---

[5] Greve alleges that the Bergs and Rosenthals are liable as former owners of the Angeles site and former employees, officers, directors and/or shareholders of Angeles. Greve alleges "by and for itself only, that there were releases of petroleum hydrocarbons at or adjacent to the Angeles Site." However, Greve does not sue Angeles itself, nor the Lockes, for these discharges.

[6] The Bergs and Rosenthals had also been sued by Greve for Angeles's conduct. As we explain, it does not appear that they sought indemnity for Greve's claims.

[7] Each individual filed his or her own cross-complaint.

[8] As McKesson's action against the Bergs and Rosenthals was defended, and ultimately settled, by Angeles's insurers, it does not appear that the Bergs and Rosenthals can pursue a cause of action for Angeles's failure to defend and indemnify them *with respect to McKesson's action*. This apparently leaves, as the sole basis for the contractual indemnity claim of the Bergs and Rosenthals, Angeles's alleged failure to defend and indemnify them with respect to cleanup costs sought by the government through *administrative proceedings*. If so, a question arises as to whether their claim is an inappropriate attempt to obtain insurance coverage for administratively imposed cleanup costs, which would not otherwise be covered, as the Bergs and the Rosenthals have not anywhere alleged that they have been *sued* for such costs by a governmental entity. (See *Certain Underwriters at Lloyd's of London v. Superior Court* (2001)

contractual indemnity with respect to Greve's action against them. However, remaining causes of action, including several under CERCLA, alleged that Angeles and Greve are responsible for contamination at both the Angeles and McKesson sites, and must therefore reimburse the Bergs and Rosenthals for response costs.

Great American agreed to defend its insureds in each action, subject to a reservation of rights. Specifically, it agreed to defend (1) Angeles, the Lockes, the Bergs and the Rosenthals against the claims of McKesson; (2) Angeles and John Locke against the claims of the McKesson owners; (3) the Bergs and Rosenthals against the claims of Greve; and (4) Angeles against the claims of the Bergs and Rosenthals. Two other Angeles insurers, Fireman's Fund and Charter Oak, also accepted the tender; each, along with Great American, has been paying a pro rata share of the defense costs.

### 3. The McKesson Settlements

A settlement was negotiated between Great American and Fireman's Fund on one side and McKesson on the other. The circumstances of the settlement negotiation, and the terms of the settlement itself, are both disputed. This much is clear: (1) McKesson dismissed its counterclaim against Angeles, the Lockes, the Bergs and the Rosenthals *with prejudice*; (2) Great American paid McKesson $500,000, out of a total payment of $2 million; (3) the complaint of Angeles, Greve and John Locke against McKesson was unaffected; and (4) there was no written release of future claims. Beyond that, the parties dispute nearly every fact surrounding the settlement, including whether the insureds were informed of the settlement negotiations, whether their input was sought, and whether the settlement was memorialized in writing. Indeed, Angeles and the Lockes[9] suggest that there may not have been a settlement *at all*, and that McKesson's dismissal was simply voluntary.[10]

24 Cal.4th 945, 951 [103 Cal.Rptr.2d 672, 16 P.3d 94]; *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 878–879 [77 Cal.Rptr.2d 107, 959 P.2d 265].)

[9] The Bergs and Rosenthals do not pursue this particular argument.

[10] The argument appears to be based on the way McKesson's underlying claims were dismissed. McKesson moved for a voluntary dismissal with prejudice of its claims against all of Great American's insureds. McKesson submitted a proposed order which included language indicating a "find[ing]" that the dismissal was sought pursuant to a settlement agreement, which "is incorporated herein by reference." The trial court responded with an order simply stating that the motion for voluntary dismissal with prejudice was "granted" and that McKesson's claims were dismissed with prejudice. From this, Angeles and the Lockes conclude that McKesson's claims against the insureds were voluntarily dismissed with prejudice, not dismissed *as part of the settlement*.

A settlement was also reached by Great American and Fireman's Fund with the McKesson owners[11] with respect to their counterclaims against Angeles and John Locke. This settlement was memorialized in writing. The claims were settled for a payment of $50,000,[12] and were voluntarily dismissed with prejudice. Under the written settlement agreement, the insurers also waived any claim for attorney fees and costs which the insurers had paid in connection with the McKesson and McKesson owners' counterclaims.

### 4. *The Declaratory Relief Action*

Great American's policy provided that it had the right and duty to defend any claim against the insured seeking damages within the scope of coverage of the policy. It further provided that Great American "shall not be obligated . . . to defend any suit after the applicable limit of [its] liability has been exhausted by payment of judgments or settlements." As Great American had paid $500,000, and its policy had a $500,000 aggregate limit, it brought the instant declaratory relief action against its insureds,[13] seeking a declaration that it had exhausted its policy and was therefore no longer required to defend the underlying action. The complaint alleged exhaustion of the aggregate limit for property damage[14] and the combined single limit— "aggregate or occurrence or both"—of the policy. In this latter cause of action, Great American contended that the claims asserted against its insureds arose out of a single occurrence. This allegation, while not the essence of Great American's complaint, would later be the basis of a charge of bad faith.

The insureds responded with demurrers and motions to stay the action. In their demurrers, the insureds argued that Great American had failed to name indispensible parties—specifically, the other insurance carriers who would be required to take over the defense obligation if Great American was no longer required to defend. They also argued that the complaint was uncertain as it failed to attach the settlement agreement on which Great American's $500,000 payment had been based. Finally, Angeles and Locke argued that Great American's policy itself defeats Great American's claim of exhaustion,

---

[11] By this time, the McKesson owners had assigned their claims to McKesson.

[12] The claims were settled for $50,000 to be paid by Great American and Fireman's Fund. It is not clear how much, if any, Great American paid toward this settlement.

[13] Great American named all of its insureds, including the Lockes. However, all of the complaints that had named the Lockes as defendants have been dismissed. It would thus appear that Great American has no further dispute with the Lockes with respect to any continuing duty to provide them with a defense.

[14] Great American brought two causes of action seeking declaratory relief based on exhaustion of "an aggregate limit for property damage." One alleged exhaustion of "All Applicable Policy Limits for Damage." The other alleged exhaustion of "All Applicable Aggregate Limits for Property Damage." We fail to see a difference between these causes of action.

as the policy language provided for a *separate* aggregate limit for "property damage for which liability is assumed by the named insured under contracts covered by this policy." Angeles argued that since the Bergs and Rosenthals brought a claim for contractual indemnity against Angeles, this separate limit was triggered and the policy was therefore not exhausted.[15]

The insureds also brought motions to stay the declaratory relief action, on the basis that factual issues which would need to be resolved in the declaratory relief action overlap with factual issues which are at issue in the underlying action. The purportedly overlapping factual issues the insureds identified fall into three major categories: (1) issues related to the number of pollution occurrences which took place; (2) issues related to whether the contractual indemnity claims pursued by the Bergs and Rosenthals against Angeles would be subject to a separate aggregate limit; and (3) issues related to bad faith.

As to bad faith, the insureds argued that, depending on the outcome of the underlying action, the insureds might chose to file a bad faith counterclaim against Great American in the declaratory relief action. Specifically, such a counterclaim would allege Great American acted in bad faith *by seeking declaratory relief* on the basis of "a legal standard it knew to be improper," that is, that there was only a single occurrence. The insureds further alleged that, "[a]dditional grounds for a bad faith action, which necessarily involve resolution of factual issues intertwined in the underlying litigation, also exist," although they failed to further identify such grounds.

In its opposition to the motions to stay, Great American explained that any argument based on the number of occurrences of pollution is a red herring. It stated, "under the plain and unambiguous language of the Great American insurance policy, it is irrelevant whether contamination at the McKesson Site resulted from one or more occurrences. The Great American [p]olicy imposes an *aggregate limit* for payment of a single occurrence policy limit, regardless of the number of occurrences that actually caused the property damage." Great American argued that the issue of whether the aggregate policy limit was exhausted by its payment toward the McKesson settlement is a question of law, which is simply not at issue in the underlying litigation. As to the insureds' argument that a second aggregate limit applies to the contractual indemnity claim of the Bergs and Rosenthals, Great American argued that the issue raised is whether the lease under which the Bergs and Rosenthals seek indemnity is a "covered contract" under the policy, which is also an issue of law not at issue in the underlying litigation. Great American also submitted a

---

[15] As we noted, however, in footnote 8, *ante*, there is a question as to the viability of such claim to coverage if the indemnity claim asserted by the Bergs and the Rosenthals is not based upon a *suit* filed against them to recover cleanup costs.

declaration indicating that it had already paid over $1.8 million in defense costs related to the underlying litigation, and argued that the bills were continuing with no apparent end in sight.

In their reply memorandum, Angeles and the Lockes argued that the separate aggregate limit for contractual indemnity claims disproves exhaustion *as a matter of law*, yet simultaneously argued that whether that limitation is triggered by the Bergs and Rosenthals' contractual indemnity claim "[n]aturally" turns on facts to be litigated in the underlying case. In an attempt to identify these purportedly common factual issues, Angeles and the Lockes suggested that the issue of policy exhaustion turns on whether "the claims against Angeles in the underlying litigation arose out of a defined number of occurrences, and . . . none of those occurrences have resulted in a duty to indemnify the [Bergs and Rosenthals]." Angeles and the Lockes argued that, in order to establish coverage for the indemnity claims of the Bergs and Rosenthals against Angeles, Angeles "w[ould] be forced to prove the [Bergs and Rosenthals'] own contractual claims in order to trigger the contractual provision in the policy."

In their reply memorandum,[16] *for the first time*, the insureds also argued that the additional two months of coverage added to the policy period gave rise to a *second* aggregate annual limit. They argued that whether the second limit applies implicates the factual issues of the number *and timing* of occurrences of pollution, which are at issue in the underlying litigation.

Also for the first time, the insureds raised the issue of "artificial exhaustion" of the policy by the McKesson settlement. The insureds *did not argue* that the McKesson settlement was a "sweetheart deal" by which McKesson agreed to accept much more than its claims were worth, enabling the insurers to claim exhaustion. Instead, the insureds argued that the policy was artificially exhausted because Great American paid "less than its policy limits" to McKesson. They argued that resolution of the "artificial exhaustion" issues is, again, inextricably intertwined with resolution of the issues pending in the underlying action.

A hearing was held on the motions to stay and the demurrers. During argument, counsel for Great American suggested that if a bad faith counterclaim is filed, the counterclaim could be severed or stayed while the declaratory relief action proceeds. The trial court ultimately granted the motion to stay, and therefore concluded the demurrers were moot.

In its written ruling, the trial court focused on the possibility of artificial exhaustion. The trial court was concerned that the insureds might eventually

---

[16] The Bergs and Rosenthals filed a joinder in the reply filed by Angeles and the Lockes.

argue that Great American knowingly paid too much in settlement of the McKesson claims, so that it would be able to claim policy exhaustion and avoid further defense costs. The trial court opined that resolution of such a bad faith claim would depend on the ultimate determination, in the underlying action, of whether Great American or McKesson was, in fact, responsible for the pollution on the neighboring sites. Because it believed the issues raised by this hypothetical bad faith claim would overlap with the issues to be resolved in the underlying litigation, the trial court concluded that a stay was appropriate.

Great American petitioned this court for a writ of mandate directing the trial court to vacate its stay order.[17] We requested opposition, then issued an order to show cause in which we identified specific issues for the parties to brief. Subsequently, we requested an additional round of briefing on specific issues. The parties have also filed several requests for judicial notice, all of which have been granted.

While the writ petition has been pending, the first phase of the trial in the underlying action has been set for October 13, 2009. At oral argument in the instant matter, counsel for Great American represented that it will continue to defend the insureds through this first phase of trial.[18]

### ISSUES PRESENTED

As we will discuss, the key issue to be resolved in connection with the insureds' motion to stay is whether there are any issues to be resolved in the declaratory relief action that would overlap with issues to be resolved in the underlying action, such that proceeding on the declaratory relief action could prejudice the insureds in the trial of the underlying action. The insureds argue possible overlap of three categories of issues: (1) issues regarding the policy extension; (2) issues regarding the additional aggregate limit for contractual indemnity claims; and (3) issues regarding the insureds' as yet unfiled counterclaim for bad faith. We conclude that there are no issues in either of the first two categories that would overlap with the issues to be litigated in the underlying action, and that it is premature to consider any issues which may be raised in a bad faith counterclaim which has not yet been filed. We therefore conclude that the trial court erred in issuing a stay of

[17] Great American also argued, in the alternative, that the insureds be required to provide an undertaking to ensure that it could recover any defense costs advanced while the stay was pending. In light of our decision in this matter, we have no need to reach or discuss that issue in this opinion.

[18] In reciting this commitment by Great American, we assume that it is based upon the understanding that the trial of the first phase of the underlying action will indeed begin on October 13, 2009, or a date reasonably close thereto.

the declaratory relief action on the basis of overlap. We therefore will remand for a reconsideration of Great American's motion for a stay, on grounds other than factual overlap.

## DISCUSSION

### 1. General Principles Applicable to Declaratory Relief Actions with Respect to Duty to Defend

■ Our Supreme Court has stated, "It is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] As we said . . . , 'the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy.' [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]" (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].)

In determining whether a duty to defend exists, courts compare the allegations of the underlying complaint with the terms of the policy. (*Horace Mann Ins. Co. v. Barbara B., supra*, 4 Cal.4th at p. 1081.) Facts extrinsic to the complaint may also be considered. (*Montrose Chemical Corp. v. Superior Court, supra*, 6 Cal.4th at pp. 295, 298–299.) In either event, if a *potential* for coverage exists, there is a duty to defend.

Normally, the insurer must defend until the underlying action is resolved by settlement or judgment. However, circumstances may change such that there is no longer a potential for coverage by, for example, (1) the discovery of new or additional evidence, (2) a narrowing or partial resolution of claims in the underlying action, or (3) the exhaustion of the policy. (*Montrose Chemical Corp. v. Superior Court (Canadian Universal Ins. Co.)* (1994) 25 Cal.App.4th 902, 909 [31 Cal.Rptr.2d 38]; *Heredia v. Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1357 [279 Cal.Rptr. 511].) When any such circumstances exist, an insurer may bring a declaratory relief action,[19] in order to conclusively establish that there is no longer a duty to defend.

---

[19] In *Ringler Associates, Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165 [96 Cal.Rptr.2d 136], the court concluded that "there is no particular requirement that an insurer ask the permission of a trial court before withdrawing from a defense, once the insurer has determined that no potential for indemnification liability exists." (*Id.* at p. 1192.) However, the court stated that it may be "prudent" to do so. (*Ibid.*) Indeed, an insurer that withdraws a defense without first obtaining a judicial declaration that a potential for coverage no longer exists does so at its own risk. This, however, is not an issue here, as Great American did bring such an action.

(*Haskel, Inc. v. Superior Court* (1995) 33 Cal.App.4th 963, 975 [39 Cal.Rptr.2d 520].) To prevail in a declaratory relief action regarding the duty to defend (where the issue cannot be resolved as a matter of law), "the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." (*Montrose Chemical Corp. v. Superior Court, supra*, 6 Cal.4th at p. 300.)

Great American brought such an action. It sought a judicial determination that its policy had been exhausted, so that it was entitled to withdraw from the continued defense of its insureds in the underlying action. There is no dispute, however, that Great American has continued to pay defense costs while its declaratory relief action has been pending, and, indeed, will continue to do so through the upcoming first phase of the trial.

### 2. General Principles with Respect to Staying a Declaratory Relief Action

When a declaratory relief action regarding the duty to defend depends on coverage issues, it may be that the resolution of those issues might prejudice the insured in the underlying litigation. "For example, when the third party seeks damages on account of the insured's negligence, and the insurer seeks to avoid providing a defense by arguing that its insured harmed the third party by intentional conduct, the potential that the insurer's proof will prejudice its insured in the underlying litigation is obvious." (*Montrose Chemical Corp. v. Superior Court, supra*, 6 Cal.4th at p. 302.) Under those circumstances, the proper course of action is to stay the declaratory relief action until resolution of the underlying action. (*Id.* at pp. 301–302.) However, if the declaratory relief action can be resolved without prejudice to the insured in the underlying action—by means of undisputed facts, issues of law, or factual issues unrelated to the issues in the underlying action—the declaratory relief action need not be stayed. (*GGIS Ins. Services, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1493, 1505 [86 Cal.Rptr.3d 515].)

A court considering whether to stay a declaratory relief action must therefore consider precisely which issues are to be litigated in order to resolve the declaratory relief action, and whether those issues are related to *factual* issues yet to be litigated in the underlying action. (See *Haskel, Inc. v. Superior Court, supra*, 33 Cal.App.4th at p. 980.) If the factual issues to be resolved in the declaratory relief action overlap with issues to be resolved in the underlying litigation, the trial court *must* stay the declaratory relief action. If there is no such factual overlap and the declaratory relief action can be resolved on legal issues or factual issues unrelated to the issues in the

underlying action, the question as to whether to stay the declaratory relief action is a matter entrusted to the trial court's discretion.

In exercising such discretion, however, the trial court should consider the possibility of prejudice to *both* parties. Case law has identified three types of potential prejudice to an insured. As we will explain, however, two of these types of prejudice are simply the prejudice which arises when there is factual overlap with the issues in the underlying action. First, an insured may be prejudiced if the insurer "join[s] forces with the plaintiffs in the underlying action[] as a means to defeat coverage." (*Montrose Chemical Corp. v. Superior Court (Canadian Universal Ins. Co.*), *supra*, 25 Cal.App.4th at p. 910.) This type of prejudice would arise in the hypothetical discussed earlier, where an insurer attempts to avoid coverage by arguing that its insured harmed the third party by intentional conduct—proof of which would obviously be of great assistance to the third party in the underlying action. Clearly, this type of prejudice arises only in cases of factual overlap. If the factual issues in the declaratory relief action *do not* overlap with factual issues in the underlying action, there is no issue on which the insurer can align with the third party plaintiff.

"[A second] sort of prejudice occurs when the insured is compelled to fight a two-front war, doing battle with the plaintiffs in the third party litigation while at the same time devoting its money and its human resources to litigating coverage issues with its carriers." (*Montrose Chemical Corp. v. Superior Court (Canadian Universal Ins. Co.*), *supra*, 25 Cal.App.4th at p. 910.) This type of prejudice does not depend on the existence of factual overlap with the underlying action, and will, in fact, be an issue for the trial court to consider *every time* an insured seeks to stay a declaratory relief action while the underlying action is still pending.

"[Thirdly], there is the collateral estoppel issue. If the declaratory relief action is tried before the underlying litigation is concluded, the insured may be collaterally estopped from relitigating any adverse factual findings in the third party action, notwithstanding that any fact found in the insured's favor could not be used to its advantage." (*Montrose Chemical Corp. v. Superior Court (Canadian Universal Ins. Co.*), *supra*, 25 Cal.App.4th at p. 910.) This third type of prejudice, like the first, clearly depends upon factual overlap with the underlying action.

As already noted, the court must also consider possible prejudice to the insurer that may be caused by staying the declaratory relief action. In such event, the insurer would be required to continue to pay defense costs until the declaratory relief action is resolved. If the insurer is correct and, in fact, it has no further duty to defend, it may nevertheless be required to keep paying

defense costs indefinitely while the declaratory relief action is stayed. "For this reason, the trial court should not hesitate to fashion orders which attempt to balance these conflicting concerns." (*Montrose Chemical Corp. v. Superior Court (Canadian Universal Ins. Co.)*, *supra*, 25 Cal.App.4th at p. 910.)

■ In sum, in a case in which there is no factual overlap with the issues to be resolved in the underlying case, the trial court must exercise its discretion on a motion for stay, balancing the insured's interest in not fighting a two-front war against the insurer's interest in not being required to continue paying defense costs which it may not owe and likely will not be able to recoup. These competing interests will be circumstance specific, depending, inter alia, on such factors as the anticipated duration of the underlying litigation, whether the insured has separate counsel in the two actions, and the availability of other insurance to cover the costs of defense.

The trial court in this case, however, resolved the stay issue solely on the basis of the existence of factual issues which overlapped with issues to be litigated in the underlying action—specifically, whether Angeles was in fact liable to McKesson in an amount such that the $2 million McKesson settlement was solely in Great American's interest. In this writ petition, the insureds do not pursue that precise argument, although they argue that other issues present an overlap which requires staying the declaratory relief action. Additionally, they argue that they would be prejudiced if they were forced to defend the declaratory relief action, while Great American would not be prejudiced if the action is stayed. Great American, not surprisingly, disagrees.

### 3. The Defense Cost Burden

The insureds argue that Great American would not be prejudiced if forced to continue to defend, because any defense costs it may advance after exhaustion of its policies would be reimbursed by the insureds' other carriers. Similarly, Great American argues that the insureds will not be prejudiced if it obtains a declaratory judgment of exhaustion while the underlying action is pending, because the insureds would continue to receive a defense from other carriers.[20] Both parties may well be correct. The argument appears to cut both ways.

■ While an insurer seeking declaratory relief that its policy has been exhausted must continue to pay defense costs until it obtains a judgment in its

---

[20] In the insureds' reply in support of their motion to stay, they argued, "Now, staring down the barrel of years and years of litigation in connection with [additional environmental actions which are likely to be brought, Great American] is attempting to leave prematurely."

favor, the duty during this period "should be considered contingent. A primary insurer which ultimately proves earlier exhaustion of limits may obtain reimbursement for expenses for which other insurers are obligated." (*Hartford Accident & Indemnity Co. v. Superior Court* (1994) 23 Cal.App.4th 1774, 1777 [29 Cal.Rptr.2d 32] [regarding reimbursement from excess insurers]; cf. *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1040–1041 [123 Cal.Rptr.2d 256] [insurers at the same level of risk are entitled to equitable contribution from each other for defense costs in proportion to their coverage of the risk].)

At oral argument, Great American conceded that it would be entitled to equitable contribution from other primary carriers, with the caveat that such other carriers would have to still be in existence and solvent. This condition, however, clearly applies as well to Great American's argument that the insureds would be defended by the other carriers if Great American is found to have exhausted its policy. Our conclusion on this point is not that, as a factual matter, the other policies are necessarily available for defense costs. Instead, we conclude that the benefit or risk of the availability of such other coverage appears to fall *equally* on both the insureds and Great American, thus eliminating, to an equal degree, any possibility that one party or the other will be left unreimbursed for defense costs they were not legally obligated to pay. We also conclude that, as both parties represent that the other coverage will, in fact, be available to their opposing party, they can hardly argue that it will not be available to them. We therefore can now turn to the critical issue in this appeal—that of potential factual overlap.

### 4. *No Issues Raised by This Action Factually Overlap with Issues to Be Tried in the Underlying Action*

#### a. *Issues Regarding the Extension of the Policy*

The policy was originally written for a one-year term, with an aggregate limit of $500,000. Subsequently, an endorsement issued indicating that policy period was "amended" to encompass an additional two months, with an additional premium. The language of the policy discussing the aggregate limit indicates that it applies "during each succeeding *annual* period while this policy is in force." (Italics added.) The policy ultimately lasted for 14 months. Great American argues, in the declaratory relief action, that there is a single aggregate limit for that 14-month term. The insureds argue, in opposition, that a first aggregate limit applied for the first "annual period" and that a second aggregate limit applied for the additional two-month period.[21]

---

[21] Angeles and the Lockes argue, "Unless the endorsement created a new separate $500,000 policy limit for property damages, in addition to the pre-existing $500,000 limit, then the endorsement would have been surplusage." The argument is specious. Even without an

■ This raises an issue of policy interpretation that can be argued and resolved in the declaratory relief action. What it does not raise is any issue that is relevant to the underlying litigation. The policy language will need to be interpreted according to the rules of contract interpretation. The language of the contract will need to be considered; extrinsic evidence may be introduced to establish and interpret any ambiguity. If policy language is found to be ambiguous, that issue must be resolved in a manner consistent with the objectively reasonable expectations of the insureds. (*GGIS Ins. Services, Inc. v. Superior Court, supra*, 168 Cal.App.4th at pp. 1506–1507.) None of these issues have anything to do with who is responsible for the environmental contamination on the Angeles site or any other factual matter at issue in the underlying action.[22]

The insureds argue that, once they establish two policy periods, they would then be required to establish multiple occurrences (e.g., one in each policy period) in order to defeat declaratory relief. The insureds misapprehend the scope of the duty to defend; it applies when there is a *potential* for coverage. If there *are* two policy periods, as a matter of contract interpretation, the insureds need only establish that, among all of the settled and pending claims against them, it is *possible* that there was at least one occurrence in each policy period. This determination would begin (and possibly end) with a comparison of the complaints at issue (although, if necessary, it could include extrinsic evidence regarding the claims asserted against the insureds). The insureds would *not* be required to *establish* multiple occurrences; they would only need to show that the claims against them could be interpreted to *allege* multiple occurrences. This determination would not require the insureds to litigate any facts at issue in the underlying litigation—indeed, merely establishing that multiple occurrences *are* at issue in the underlying litigation would meet the insureds' burden in this respect. Thus, no issues relating to

---

additional aggregate policy limit, the endorsement would have provided an additional two months in which Angeles would be *covered.* Such an endorsement would only be worthless if Angeles had already exhausted the $500,000 aggregate limit at the end of the first year.

[22] Angeles argues that, in litigating this issue, it might be required to introduce parol evidence which could prejudice it in the underlying litigation. Specifically, it suggests that it "would be forced to provide evidence related to its reasons for seeking an additional policy period and whether those reasons involved known or suspected contamination or spills at the Angeles or McKesson sites, and whether those releases were accidental or intentional." We reject this argument for three reasons. First, the issue of prejudicial parol evidence of Angeles's intent in seeking a policy extension was not raised before the trial court. Second, parol evidence of *unspoken subjective intent* is irrelevant to contract interpretation. Third, the idea that Angeles contacted Great American and *expressed* that it needed to extend its policy for two months because it was aware that it was contaminating the groundwater and expected to continue doing so—and that Great American agreed to provide it an additional $500,000 of coverage under such circumstances—is patently absurd.

whether there was a second policy term would overlap with issues related to the underlying litigation.

      b.   *Issues Regarding Second Aggregate Limit for Contractual Indemnity Claims*

The policy language indicates an aggregate limit for property damage arising out of operations, and a second aggregate limit for "property damage for which liability is assumed by the named insured under contracts covered by this policy." Great American does not appear to contest the fact that, if the indemnity claims of the Bergs and Rosenthals against Angeles are based on a covered contract, those claims would be subject to an aggregate limit separate and distinct from the aggregate limit applicable to McKesson's claims based on property damage arising out of operations. What Great American *does* dispute is that the lease is a contract covered by the policy.[23] This, too, raises issues solely relating to policy interpretation. Whether the lease is a covered contract requires interpreting the insurance policy and the parties' joint intent in entering into it;[24] the issue does not require determining who is responsible for polluting the Angeles and McKesson sites.[25]

      c.   *Issues Regarding Bad Faith*

We next turn to the purported factual issues that may arise out of the insureds' potential claim of bad faith. Although the insureds have indicated that they may file a counterclaim for bad faith in the declaratory relief action, they have not yet done so, nor have they provided the court with a proposed pleading alleging a counterclaim for bad faith. Thus, we are not in a position to consider the specific allegations that might be made in any bad faith complaint, and compare those allegations with the issues yet to be litigated in the underlying action.[26] As movants on the motion to stay, the insureds bore

---

[23] Great American does not further explain this argument.

[24] Angeles argues that to establish coverage, it would be required to *prove* the validity of the indemnity agreement, which would prejudice its ability to assert contract defenses to the indemnity agreement in the underlying action. Again, Angeles misunderstands its burden to trigger the duty to defend. Angeles need not establish the indemnity agreement is valid, but only that the Bergs and Rosenthals allege that it is.

[25] Similarly, if Great American seeks to argue that the government claim for which the Bergs and Rosenthals seek contractual indemnity is not a claim covered by the policy (see *ante*, fn. 8), this issue as well would be one of policy interpretation, and would not have any overlap with factual issues to be resolved in the underlying action.

[26] Indeed, the trial court granted the stay based on an argument it believed the insureds could maintain, but which was not an argument that the insureds had made before it. Having been presented this argument by the trial court, the insureds have not adopted it in this proceeding. This demonstrates the folly of attempting to seek a stay based on a potential conflict caused by a pleading that has not yet been filed.

the burden of proof that a stay was necessary. Arguments that a stay may be necessary due to some unidentified allegations, which may appear in a future bad faith counterclaim the insureds may someday file, are simply insufficient to meet this burden.

### 5. *Factors to Be Considered on Remand*

We have concluded that the insureds have failed in their burden of establishing that a stay of the declaratory relief action is necessary on the basis that the declaratory relief action implicates factual issues which are at issue in the underlying litigation. Therefore, the trial court erred in granting the motion to stay on that ground. In doing so, it had no occasion to balance the possible prejudice to the parties by the grant or denial of the insureds' motion to stay.'

We therefore will grant Great American's petition and remand to the trial court with directions to reconsider the motion for a stay. Upon remand, the trial court should exercise its discretion based solely on balancing the prejudice to the insureds if they are required to litigate both cases at once against the prejudice that Great American will sustain if it is forced to continue to provide a defense until the underlying action is resolved. In this respect, we draw the trial court's special attention to the following undisputed facts: (1) Great American has been advancing defense costs during the nearly two-year pendency of this writ petition; (2) Great American has agreed to continue to advance defense costs for the phase of trial set to commence imminently; (3) the remaining phases of the underlying litigation have no set timeframe for completion; and (4) the insureds concede that they have millions of dollars in coverage from other insurance policies—all of which, according to the insureds, include a duty to defend.

In addition, the trial court should also consider alternative methods available to achieve a fair balance of the interests of both sides in the event it determines that simply granting or denying a stay would not achieve that result. For example, the insureds' demurrers have already been briefed and are ready for resolution. Perhaps the demurrers can be resolved immediately, without requiring the insureds to fight a two-front war. A similar analysis may be applied to a possible motion for summary judgment. We do not intend to prejudge or give undue weight to any of these issues; we simply encourage the trial court to consider them as may be appropriate in light of all of the circumstances.

## DISPOSITION

The petition is granted. The trial court is directed to vacate its order staying the proceedings in the declaratory relief action, and to reconsider the motion in a manner consistent with the views expressed in this opinion. Great American shall recover its costs in connection with this proceeding.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied October 28, 2009.