Filed 9/3/14  Kaplan Stahler Agency v. Gumer CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KAPLAN STAHLER AGENCY, INC., | B249041 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. BC412509) |
| v. | |
| ROBERT GUMER, | |
| Defendant, Cross-complainant and Appellant. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Charles F. Palmer, Judge.  Affirmed.

Bostwick Law and Gary L. Bostwick for Plaintiff, Cross-defendant and Appellant.

Wolf, Rifkin, Shapiro, Schulman & Rabkin, Roy G. Rifkin, Marc E. Rohatiner, and Ryan J. Stonerock for Defendant, Cross-complainant and Appellant.

This appeal and cross-appeal involve claims asserted by Robert Gumer (Gumer)[1] for compensation allegedly owed him under a written contract with Kaplan Stahler Agency, Inc. (KSA)[2] and KSA's claims against Gumer for tortious interference with contract. Following a bench trial, the trial court entered judgment in favor of KSA on all causes of action asserted by Gumer against KSA and in favor of Gumer on all claims asserted against him by KSA. We affirm the judgments.

## BACKGROUND

KSA is a talent agency specializing in representing writers for television and other media. Its sole principals are Mitchell Kaplan (Kaplan) and Eliot Stahler (Stahler).

Gumer is an attorney and the former Director of Business Affairs at Columbia Pictures Television. He was employed by KSA as a subagent in 1995. During the early years of Gumer's employment at KSA, there was no written agreement between the parties.

**The 1997 agreement**

In April 1997, Gumer, Kaplan, and Stahler entered into a written agreement drafted by Gumer (the 1997 Agreement) covering Gumer's compensation during the three-year period commencing on April 16, 1997 and ending on April 15, 2000. The 1997 Agreement provided in pertinent part that Gumer would receive a base salary each year, as well as an annual bonus based on a percentage of revenues received by KSA from client deals booked by Gumer, minus Gumer's base salary and any pension contributions made by KSA on Gumer's behalf. The 1997 Agreement further provided that if in any year Gumer's base salary and pension contribution exceeded the amount of his bonus, Gumer's base salary for the following year would be reduced by the amount of the shortfall. The 1997 Agreement is silent regarding Gumer's entitlement to bonus compensation for revenues received by KSA after expiration of the agreement but as the

---

[1]    Gumer is the defendant, cross-complainant, and appellant in this action.

[2]    KSA is the plaintiff and cross-defendant, and has filed a cross-appeal in this action.

2

result of client deals booked by Gumer during the term of agreement. There were no discussions between the parties concerning Gumer's entitlement to compensation for such post-termination revenues while the 1997 Agreement was being negotiated.

No written changes or oral modifications altered the 1997 Agreement during its term. The 1997 Agreement expired by its terms on April 15, 2000.

**The 2000 agreement**

In April 2000, Gumer and KSA entered into a second written agreement (the 2000 Agreement) for a three-year term commencing on April 15, 2000 and ending on April 14, 2003. The 2000 Agreement states that Gumer was entitled to compensation "[i]n each Employment Year . . . that [he] remains in the employ of the Agency" calculated as a percentage of commissions actually billed and received by KSA that were attributable to clients for whom Gumer was primarily responsible.

At the time the parties entered into the 2000 Agreement, there were no discussions concerning Gumer's entitlement to commissions received by KSA after expiration of the agreement on account of work booked by Gumer during the term of the 2000 Agreement, nor were there any changes or modifications to the 2000 Agreement. The 2000 Agreement expired on April 14, 2003.

**The post-April 2003 time period**

After the 2000 Agreement expired, the parties did not enter into another written agreement. KSA and Gumer, through separate counsel, negotiated a new employment agreement in July 2004, but the unsigned draft agreement (the 2004 draft agreement) was never executed. Although the 2004 draft agreement was never signed, the parties adhered to the essential provisions of that draft agreement as governing the terms of Gumer's employment with KSA.

Gumer continued to be compensated on the same basis as he was compensated under the 1997 and 2000 Agreements (i.e., a base salary plus a percentage of revenues from client deals booked by Gumer), albeit using different bonus percentage formulas.

The 2004 draft agreement contained a provision governing Gumer's compensation in the event of his death or termination of his employment. After stating the

3

compensation to be paid, the 2004 draft agreement expressly stated that KSA would have no further obligation or liability to Gumer, "including, without limitation, the provision of any other benefits and compensation attributable to the remaining Term."

In 2005 Gumer's annual salary was reduced to $450,000 and in 2007 it was reduced again to $225,000. In mid-November 2008, KSA notified Gumer of its decision to reduce his salary to $125,000 and his bonus percentage to 40 percent of revenue attributable to Gumer up to $750,000, 50 percent up to $ 1 million, and 60 percent thereafter. Gumer expressed his unhappiness with the new compensation arrangement and said he might seek other employment. KSA nevertheless implemented the compensation change.

On December 5, 2008, after Gumer received his paycheck, he stated angrily, "'If this is the way that they're going, then I'm leaving and destroying the agency.'" The parties met three times thereafter, on December 11, December 15, and December 16, 2008, in an effort to resolve their differences. They were unable to do so, and Gumer resigned on December 16, 2008.

Gumer told the KSA clients for whom he had been primarily responsible that he was leaving KSA because of a dispute over the payment of commissions. Gumer also sent those clients a form letter for them to use to terminate their respective relationships with KSA. After Gumer's departure from KSA, several clients terminated their relationship with KSA by signing and sending the form letter.

**Zuckerman revenues**

At the center of the parties' dispute are revenues generated by former KSA clients for whom Gumer was primarily responsible, including a client named David Zuckerman (Zuckerman). In 1998, during the term of the 1997 Agreement and as the result of Gumer's efforts, Zuckerman entered into a contract with Twentieth Century Fox Television relating to the show *Family Guy*. Zuckerman left KSA for another agency in 2000 or sometime thereafter, but before he began receiving payment for his work on *Family Guy*.

4

In 2007, KSA first began to receive Zuckerman's *Family Guy* profit participation statements from Twentieth Century Fox. The statement KSA received for the period ending November 2007 provided for a $751,993 quarterly payment to Zuckerman. Zuckerman's profit participation statements in 2008 provided for payments of $240,769, $1,680,522, and $947,676.

As the talent agency representing Zuckerman, KSA was paid 10 percent of the *Family Guy* revenues generated as the result of Gumer's efforts. KSA paid Gumer a percentage of the agency's 10 percent share of the Zuckerman revenues. In November 2008, KSA advised Gumer that his percentage of client revenues would be reduced from 60 percent to 40 percent.

## PROCEDURAL HISTORY

KSA commenced the instant action in April 2009. Its first amended complaint alleges five causes of action against Gumer for tortious interference with contractual relationships with five former KSA clients for whom Gumer was primarily responsible while he was employed at KSA -- Zuckerman, R.J. Stewart, Denise Moss, Dava Savel, and David Slack. Gumer cross-complained against KSA, alleging in his first amended cross-complaint claims for breach of written contract based upon the 1997 Agreement, breach of written contract based upon the 2000 Agreement, breach of implied-in-fact contract, unpaid wages pursuant to Labor Code sections 2926 and 2927, quantum meruit, accounting, wrongful constructive termination, breach of implied covenant of good faith and fair dealing, and declaratory relief.

KSA filed a motion for summary adjudication, which the trial court denied except as to Gumer's cause of action for breach of the 2000 Agreement. As to that cause of action, the trial court ruled that the 2000 Agreement expressly and unambiguously states that Gumer's entitlement to compensation for revenues from client bookings was conditioned upon his continued employment by KSA. The court accordingly granted summary adjudication in favor of KSA on Gumer's cause of action for breach of the 2000 Agreement.

5

The matter proceeded to a court trial. At the conclusion of the trial, the trial court issued a statement of decision containing detailed factual findings. The trial court found that KSA had failed to meet its burden of proving that Gumer caused any client or former client of KSA to withhold commissions that were owed to KSA. The court further found that to the extent Gumer solicited his own clients to cease their relationship with KSA after he left KSA and to retain Gumer at his new agency, there was no evidence that Gumer ever agreed not to do so, and that even if he had, such an obligation would have violated California's strong public policy against non-competition covenants.

As to Gumer's claims against KSA, the trial court found that the 1997 Agreement was silent as to whether KSA's obligation to pay Gumer continued after the agreement expired; that the parties offered differing interpretations as to the extent of KSA's contractual payment obligations; and that extrinsic evidence supported KSA's interpretation that its obligation to compensate Gumer under the terms of the 1997 Agreement terminated upon expiration of the agreement.

The trial court found that after the 1997 Agreement expired, it was superseded by the 2000 Agreement, which expressly conditioned Gumer's right to any compensation upon his continued employment by KSA. The trial court further found that after the 2000 Agreement expired, the 2004 draft agreement reflected the material terms of Gumer's employment by KSA thereafter, including his compensation during that time. The trial court found that Gumer failed to meet his burden of proving a breach of the 2004 draft agreement.

The court found that Gumer's quantum meruit claim failed because he failed to prove that he did not receive all compensation to which he was entitled under the terms and conditions of his employment, and that he failed to establish any entitlement to an accounting or to declaratory relief.

Judgment was subsequently entered in favor of Gumer on all causes of action asserted against him by KSA, and in favor of KSA on all causes of action asserted against it by Gumer.

This appeal and cross-appeal followed.

# DISCUSSION

## I. Gumer's appeal

Gumer appeals from the trial court's ruling denying him relief under his causes of action for breach of the 1997 Agreement, quantum meruit, accounting, and declaratory relief.

### A. *Breach of the 1997 agreement*

Gumer contends the trial court erred by concluding that KSA had no obligation under the 1997 Agreement to pay Gumer compensation after expiration of the three-year contract term, by treating the agreement as ambiguous, and by considering extrinsic evidence, including evidence of custom and usage, to interpret the agreement.

#### 1. General principles

"The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties. [Citations.]" (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 763.) "'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' (Civ. Code, § 1638.) 'When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .' (Civ. Code, § 1639.)" (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709.)

A threshold inquiry in contract interpretation is whether the contract is ambiguous. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554-555.) An ambiguity exists when a contractual provision is capable of more than one reasonable interpretation. (*Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 73.) In such cases, the court may consider extrinsic evidence of the parties' intent. (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 979-980 (*Cedars-Sinai*).) Such extrinsic evidence can include the circumstances under which the parties negotiated or entered into the contract, the subsequent conduct of the parties, and industry custom or

7

usage.  (*Id.* at p. 980; *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114 (*Howard*).)

A two-step process is employed in deciding whether parol or extrinsic evidence is admissible.  First, "the proffered material regarding the parties' intent" is reviewed to determine "if the language is 'reasonably susceptible' of the interpretation urged by a party.  [Citation.]  If that question is decided in the affirmative, the extrinsic evidence is then admitted to aid in the second step, which involves actually interpreting the contract.  [Citation.]" (*Appleton v. Waessil*, *supra*, 27 Cal.App.4th at p. 554.)  "[P]arol evidence of *unspoken subjective intent* is irrelevant to contract interpretation." (*Great American Ins. Co. v. Superior Court* (2009) 178 Cal.App.4th 221, 239, fn. 22.)

We analyze the terms of a contract de novo when the trial court's contractual interpretation is based solely on the terms of the written instrument without the aid of extrinsic evidence and when there is no conflict in the properly admitted extrinsic evidence.  (*Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1180.)  When interpretation of a contract turns on the credibility of conflicting extrinsic evidence, an appellate court must determine whether the interpretation is supported by substantial evidence and then uphold that interpretation if it is reasonable.  (*Ibid.*)

### 2. The trial court did not err by considering extrinsic evidence

The contractual language governing Gumer's compensation for revenues from client deals booked during the term of the 1997 Agreement does not state whether or not KSA's obligation to pay Gumer compensation continued after the term of the agreement.  The language is therefore susceptible to the parties' differing interpretations.  (See *Cedars-Sinai, supra*, 137 Cal.App.4th at pp. 979-980.)  In resolving those differences, the trial court properly considered extrinsic evidence, including the circumstances under which the parties negotiated or entered into the contract, the subsequent conduct of the parties, and industry usage or custom, to interpret the contract terms.  (*Id*. at p. 980; *Howard, supra*, 208 Cal.App.4th at p. 1114.)

### 3. Substantial evidence supports the trial court's interpretation

Substantial evidence supports the trial court's interpretation of the 1997 Agreement and the conclusion that KSA's obligation to pay Gumer under the terms of that agreement terminated upon expiration of the three-year contract term.

The circumstances surrounding formation of the 1997 Agreement establish no mutual intent by the parties to compensate Gumer for revenues from client deals booked by him during the term of the agreement but received by KSA after the agreement expired. Gumer, Stahler, and Kaplan each testified that there were no discussions between the parties during negotiation of the 1997 Agreement about Gumer's entitlement to compensation for client revenues received by KSA after expiration of the contract term or after termination of Gumer's employment.

The parties' course of conduct during Gumer's employment with KSA reflects no intention by the parties to compensate Gumer under the terms of the 1997 Agreement after that agreement had expired. The evidence showed that KSA paid Gumer under the terms of the employment contract in effect at the time KSA received client revenues, regardless of when the client deal had been booked, and not under the contract terms in effect when the client deal had been booked. For example, when KSA first began receiving Zuckerman's *Family Guy* revenues in 2000, it determined Gumer's eligibility for a bonus using the bonus percentage formulas in effect under the 2000 Agreement, and not the bonus percentage in effect during the 1997 Agreement.[3] Gumer did not object to this practice. After the 2000 Agreement expired and until the time that Gumer left KSA, he was compensated for client revenues attributable to him using a bonus percentage formula set forth in the 2004 draft agreement, not the formula in effect at the time the client deal was booked.

The evidence of custom and usage in the talent industry showed that subagents such as Gumer did not receive compensation from commissions paid by clients of the

---

[3]     The 1997 Agreement provided for a 60 percent bonus percentage whereas the 2000 Agreement provided for a higher bonus percentage ranging between 65 and 85 percent.

talent agency after their employment with the agency terminated. KSA's expert witness, Christopher Barrett, a former talent agency subagent and the current owner of his own talent agency, testified that it is not the custom and practice in the talent agency business for agencies to pay post-employment compensation to subagents. Barrett further testified that the industry custom and practice is that a subagent would not be paid post-employment contingent compensation pursuant to a written agreement that was silent on the issue. Although Gumer's expert offered differing testimony regarding custom and practice in the talent agency business, the trial court expressly found Barrett's testimony to be credible.

### 4. California law does not support Gumer's position

Gumer argues that under California law, he is entitled to compensation for client work he booked during the term of the 1997 Agreement, even after that agreement has terminated and he is no longer employed by KSA, unless the agreement contains an express provision to the contrary. The cases on which Gumer relies to support this argument are distinguishable or inapposite.

In *Wilson v. Turner Resilient Floors, Inc.* (1949) 89 Cal.App.2d 589 (*Wilson*), the plaintiff claimed he was entitled to a 25 percent commission on sales he procured under both an oral and written employment agreement. The oral agreement was silent as to whether the plaintiff was entitled to continue receiving commissions after his employment terminated. The written agreement, however expressly stated that the "plaintiff was to receive payment of his percentage on the completion of his jobs, even though he left defendant's employ." (*Id*. at p. 598.) The court concluded that the plaintiff was also entitled to post-employment payment of commissions earned under the oral agreement. (*Ibid*.) The court reasoned that there was no basis for distinguishing between the payment terms under the oral and written contracts and that the parties had agreed in writing that the employee was entitled to receive post-employment payments: "While the oral agreement did not define gross profits or expressly provide that [the plaintiff] leaving defendant's employ would not terminate his right to commissions on jobs he had obtained, it is not claimed that the definition in the written contract is any

10

different from what both parties had in mind in the oral contract, and as a matter of law, under the oral contract, plaintiff's leaving the defendant's employ either voluntarily or by discharge would not terminate his right to commissions, as the contracts were completed, on sales made by him." (*Ibid.*) Here, there was no agreement, written or oral, that Gumer would continue to be paid post-employment bonuses for revenues from client work booked during the term of the 1997 Agreement. *Wilson* is thus distinguishable.

Also distinguishable are cases cited by Gumer in which employees who were paid by commission were subjected to recoupment against advance commissions the employees had previously been paid. (See, e.g., *Sciborski v. Pacific Bell Directory* (2012) 205 Cal.App.4th 1152; *DeLeon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800; *Koehl v. Verio, Inc.* (2006) 142 Cal.App.4th 1313.) The 1997 Agreement states that Gumer was entitled to payment of a "base" salary and a possible "bonus." It does not provide for payment of any "commission." Even if payment of Gumer's "bonus" could be considered a "commission," the evidence showed that KSA recouped from Gumer no money previously paid to him.

The evidence showed that Gumer was compensated throughout his employment with KSA for work booked during the term of the 1997 Agreement, even if revenues from such work were received by KSA after the 1997 Agreement expired.

### B. Gumer's remaining claims

#### 1. Quantum meruit

We review Gumer's challenge to the trial court's ruling on his quantum meruit claim under the substantial evidence standard. (*Watson v. Wood Dimension, Inc.* (1989) 209 Cal.App.3d 1359, 1365-1366.) As we discuss, substantial evidence supports the trial court's ruling.

A quantum meruit claim "rests upon the equitable theory that a contract to pay for services is implied by law for reasons of justice. [Citation.] However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation. [Citations.]"

11

(*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419 (*Hedging*).)

Equitable entitlement to a quantum meruit payment is not implied when the parties have actual contract terms covering payment. (*Hedging, supra*, 41 Cal.App.4th at p. 1419.) The trial court found that the 1997 Agreement covered the terms of Gumer's compensation and that the terms of the agreement did not require KSA to pay Gumer compensation after the three-year term of the agreement expired. The trial court further found that after the 1997 Agreement expired, it was superseded by the 2000 Agreement, which expressly conditioned Gumer's right to any compensation upon his continued employment by KSA. After the 2000 Agreement expired, the parties thereafter applied the essential provisions of the 2004 draft agreement as governing the terms of Gumer's employment. Substantial evidence supports those findings. The trial court did not err by denying Gumer relief on his quantum meruit claim.

### 2. Accounting and declaratory relief claims

Gumer was properly denied relief on his accounting claim because he failed to establish that he was owed any compensation by KSA. (See *Krantz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 178 [accounting claim "stand[s] or fall[s] depending on the fate of the antecedent substantive causes of action"].) His claim for declaratory relief was also properly denied because it was premised on the same allegations and legal theories as his other failed causes of action.

## II. KSA's Appeal

KSA challenges the denial of its claims against Gumer for tortious interference with contractual relations, arguing that the trial court failed to apply the proper legal standard and that substantial evidence supports KSA's claims. As we discuss, the trial court applied the proper legal standard and substantial evidence supports its factual findings.

To prevail on a cause of action for tortious interference with contractual relations, "a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the

12

defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citation.] To establish the claim, the plaintiff need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action. [Citation.]" (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148.)

KSA contends the trial court erred as a matter of law by concluding that causation is a necessary element of tortious interference with contract. It is well established that "[a]n essential element of a contract interference claim is proof that the defendant's conduct actually disrupted or breached the plaintiff's contract." (*Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344, 356; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514, fn. 5; *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 391.) There was no legal error.

Substantial evidence supports the trial court's finding that Gumer did not cause any client or former client of KSA to withhold commissions due KSA. Gumer testified that shortly after December 16, 2008, he notified all of his clients that he had left KSA because of a dispute over payment of client commissions. He denied telling any of his clients to stop paying commissions they owed to KSA.

Three of Gumer's clients, Zuckerman, David Slack, and Denise Moss testified at the trial. Zuckerman was already a client of Gumer's before Gumer began working at KSA, and he continued to be represented by Gumer when Gumer joined KSA. Slack and Moss each testified that they became KSA clients because they wanted Gumer to represent them. All three clients testified that they paid KSA 10 percent of revenues on deals booked by Gumer on their behalf while Gumer was at KSA. Zuckerman testified that he terminated his relationship with KSA in 2003 or 2004 while Gumer was still working at KSA but continued to pay KSA *Family Guy* commissions until the dispute between Gumer and KSA arose. Slack and Moss testified that they terminated their respective relationships with KSA after Gumer left the agency because their relationship

13

was with Gumer and not KSA. Slack and Moss further testified that at Gumer's request, they terminated their relationship with KSA so that Gumer could continue to represent them at a different talent agency. All three former clients testified that Gumer informed them that he had left KSA because of a dispute over commission payments and all three testified that they decided to stop paying commission monies to KSA for a time until the dispute was resolved. Zuckerman, Slack, and Moss each testified that Gumer never told them to stop paying commissions to KSA. Zuckerman testified that Gumer specifically told him that Gumer could not advise him to stop paying commissions to KSA. KSA was eventually paid all commission payments that were owed by former clients who withheld payment during its dispute with Gumer.

KSA ignores the substantial evidence discussed above and cites other evidence that contradicts the trial court's factual findings. Under the applicable substantial evidence standard, however, "'"[t]he power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted" to support the trial court's findings. . . .' [Citation.]" (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 589.) We must view the evidence in the light most favorable to the prevailing party, and resolve neither credibility issues nor evidentiary conflicts. (*Ibid.*) Because substantial evidence supports the trial court's factual determinations, we find no error.

## DISPOSITION

The judgments are affirmed. The parties will each bear their own respective costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.