Filed 10/14/21 Nat. Union Fire Ins. Co. etc. v. Mid-Century Ins. Co. CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MID-CENTURY INSURANCE COMPANY, et al., <br><br> Defendants and Appellants. | A156889 <br><br> (City & County of San Francisco Super. Ct. No. CGC-14-540942) |

CalPortland Company (CalPortland) has been sued many times over the years by claimants alleging it is legally liable for their asbestos exposure. Since 2012, CalPortland has been defended and indemnified by National Union Fire Insurance Company of Pittsburgh, PA. (National Union). National Union obtained a judgment against Continental Insurance Company (Continental) and Mid-Century Insurance Company (Mid-Century) establishing their obligation to contribute to past and future defense costs and future indemnity. With one adjustment to the allocation of these costs, we affirm.

1

## I. FACTS AND PROCEDURAL HISTORY

CalPortland manufactures and distributes cement products for construction purposes, at least two of which contain asbestos—Colton Gun Plastic Cement[1] and Arizona Portland Mortar Cement. Since 1983, CalPortland has been named as a defendant in more than 1,700 asbestos-related lawsuits.

Truck Insurance Exchange (Truck) issued primary insurance policies with aggregate limits of $300,000 or $100,000. Mid-Century issued nine umbrella polices during that same period which had either a $200,000 or $400,000 limit per occurrence, and which sat directly above the Truck policies, providing coverage for "the excess of loss over $300,000 [or $100,000] for each and every accident or series of accidents arising out of one occurrence. . . up to $200,000 [or $400,000]. . . ."

National Union provided CalPortland with liability insurance coverage for the five-month period from February 1, 1985–July 1, 1985. The policy had a $500,000 per occurrence limit but lacked any aggregate limit.

Continental issued a primary policy to CalMat Co. (CalMat) and numerous affiliated companies including CalPortland for the period of July 1, 1985–July 1, 1986.[2] This policy had indemnity limits of $1,000,000 per occurrence and in the aggregate,

---

[1] Gun plastic cement is a different product than plastic cement, which is also manufactured by CalPortland. (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 589.)

[2] CalPortland and an entity named Conrock merged to form CalMat, and both CalPortland and CalMat were named insureds under the Continental policy.

exclusive of defense costs, and contained an endorsement excluding coverage for bodily injury and property damage arising from the use of a gun plastic product. It also contained an exclusion for claims arising from exposure to asbestos on the premises. The Continental policy had a retrospective premium plan, which allowed Continental to calculate the premium based on losses actually incurred.

Beginning in the 1990s, CalPortland's asbestos-related defense and indemnity costs were paid on a pro-rata, time-on-the-risk[3] basis by four primary insurance carriers: (1) National Union; (2) Truck; (3) OneBeacon Insurance Company, formerly known as Commercial Union Insurance Company (OneBeacon); and (4) Continental. Truck acted as lead primary insurer and assumed CalPortland's defense for several years. Mid-Century began paying a pro-rata share of indemnity as Truck's policies exhausted. OneBeacon declared exhaustion in June 2012. The declarations of exhaustion by Truck and OneBeacon have not been challenged in this case.

In 2012, with the exhaustion of the Truck policies imminent, CalPortland gave notice that it was selecting National

---

[3] The " 'time on the risk' " method of allocating liability among primary insurers covering the same liability has been defined as "[a]pportionment based upon the relative duration of each primary policy as compared with the overall period during which the 'occurrences' 'occurred'. . . ." (*Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1861 (Stonewall).)

Union to provide a defense.[4] At approximately the same time, Mid-Century stopped contributing to the costs of defense and indemnity, claiming that its umbrella policies were subject to aggregate limits and that those limits had exhausted. Continental also stopped contributing to the costs of defense or indemnity in 2012. It offered to pay a pro rata share (based on its historic percentage of contribution) until it was able to determine in any given case whether the gun plastic exclusion applied, but National Union wanted it to contribute a greater amount and did not accept the offer. From June 2012 to September 2017, National Union paid 100 percent of the defense and indemnity costs on CalPortland's behalf.

National Union brought the current action seeking declaratory judgment, contribution, equitable subrogation and reimbursement against Continental and Mid-Century.[5] The court held a multi-phase bench trial between 2016 and 2018, and it issued an individual statement of decision after each phase.

In Phase I (Continental) National Union sought a declaration that Continental had a duty to defend and indemnify CalPortland. The court rejected Continental's argument that its

---

[4] National Union was selected because its policy did not have aggregate limits or exclusions for premises liability or gun plastic.

[5] The first amended complaint filed in January 2015 also sought declaratory relief and reimbursement against CalPortland based on the recovery of retention premiums and a declaration that CalMat owed it a duty of indemnification as a subrogee of CalPortland. These claims are not before us.

policy did not cover CalPortland due to the gun plastic exclusion. It ruled that the underlying claims were potentially covered by the underlying policy and Continental's duty to defend "continues unless and until it is established that the gun plastic product is the exclusive [CalPortland] product that allegedly caused the underlying plaintiff's injury."

In Phases I (Mid-Century) and II, the court found (1) the Mid-Century policies did not have aggregate limits; (2) exhaustion of the Truck policies triggered the Mid-Century policies, regardless of whether there had been "horizontal" exhaustion of all primary policies; and (3) the statute of limitations did not bar National Union's contribution claims. The court concluded that Mid-Century's policies included a duty to defend, which commenced when the Truck policies exhausted by 2012.

In the Final Phase of the trial, the court addressed the allocation of defense costs and indemnity among the parties and the question of whether National Union was entitled to prejudgment interest. The court adopted a pro-rata "time-on-the-risk" allocation method, with a "slight modification" of past defense costs to be paid by Continental: a 10 percent reduction to reflect that had Continental kept contributing to defense costs, it would likely have been excused from contributing in many cases where its gun plastic exclusion applied. The court calculated the percentages that each carrier would owe for past and future defense costs and future indemnity

5

costs, recognizing that not all the carriers were liable for all of the risks.

The court entered a judgment awarding National Union $823,968.32 in damages against Continental, plus prejudgment interest of $258,176.93.  It awarded National Union $8,215,534.24 against Mid-Century, plus prejudgment interest of $2,523,477.16.  Continental appealed and Mid-Century filed a cross-appeal

## II. DISCUSSION

### i. *General Principles Applicable to Equitable Contribution*

" 'In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others.  Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. . . .  The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.' "  (*Scottsdale Ins. Co. v. Century Surety Co.* (2010) 182 Cal.App.4th 1023, 1031–1032 (*Scottsdale II*).)

Equitable contribution "assumes the existence of two or more valid contracts of insurance covering the particular risk of loss and the particular casualty in question."  (*Fireman's Fund*

6

*Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1295.) If one insurer has no duty to defend or indemnify, then it cannot be held liable for equitable contribution. (See, e.g., *Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 332, 342 [where insurer's duty to defend was never triggered, it had no obligation to contribute to insured's defense costs].)

ii. *Continental's Appeal*

A. *Share of Past Defense Costs*

1. Underlying Facts

The trial court concluded in Phase I of the trial that Continental had a duty to contribute to defense costs in an underlying lawsuit unless and until it was established that the sole basis for CalPortland's liability was its production of a gun plastic product that fell within the gun plastic exclusion under Continental's policy. In anticipation of the Final Phase of the trial (allocation), the parties filed a set of stipulated facts in May 2018 that included a list of the dates (between 2009 and 2015) in which gun plastic had been determined to be the only CalPortland product at issue in 100 underlying lawsuits.[6]

---

[6] Paragraph 13 of the Stipulation provided, "Exhibit EX-2000 attached hereto identifies the dates on which the parties agree that gun plastic cement was identified as the exclusive CalPortland Company product that allegedly caused the underlying plaintiff's injury in certain of the Underlying Suits on EX-NU321. Documents identifying gun plastic cement, including the documents relied upon by the Parties to determine the date on which gun plastic was identified as the exclusive CalPortland Company product that allegedly caused the underlying plaintiff's

7

Continental argued at trial that the trial court should not require it to contribute defense costs beyond these dates because at that point there was no possibility of coverage and its duty to defend and indemnify had ceased.  (See *Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 (*Buss*) [insurer does not have duty to defend further when it is shown that no claim can be covered].)

The trial court disagreed, reasoning that Continental had a duty to defend the lawsuits at their outset and "an insurer can properly terminate disputed defense obligations in only one way—institution of declaratory relief proceedings, where the appropriate facts are brought to light so that a court can determine whether the potential for indemnity continues." Continental had not brought a declaratory relief action on or about the dates that gun plastic was discovered to be the sole CalPortland product at issue, and the court ruled it could not retrospectively rely on the 2018 stipulation as a substitute for that procedure.  Continental argues this aspect of the ruling was erroneous, and that it was entitled to a full offset for defense costs incurred after it was determined that gun plastic was the sole CalPortland product at issue.  We agree.

---

injury, and the date of each document, are also reflected on Exhibit EX-2000.  The parties dispute the legal issue of when, if at all, any obligation Continental may owe to National Union for equitable contribution terminated after gun plastic cement was identified as the exclusive CalPortland Company product that allegedly caused the underlying plaintiff's injury in the actions identified as Exhibit EX-2000."

2. Standard of Review

A trial court's order regarding equitable contribution between insurers is generally reviewed for abuse of discretion. (*Centennial Ins. Co. v. United States Fire Ins. Co.* (2001) 88 Cal.App.4th 105, 111.) Here, however, the challenged aspect of the court's ruling arises from its determination that the stipulation to facts necessary to prove an exclusion under an insurance policy did not terminate an insurer's duty to defend absent a declaratory relief action. This is a question of law subject to de novo review. (*Certain Underwriters at Lloyds, London v. Arch Specialty Ins. Co.* (2016) 246 Cal.App.4th 418, 429 [equitable contribution may call for judicial discretion, but de novo review is proper when an issue is decided as matter of law].)

Even if we were to agree with National Union that the proper standard of review is abuse of discretion, " '[t]he scope of discretion always resides in the particular law being applied; i.e., in the "legal principles governing the subject of the action. . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse of discretion." ' " (*GuideOne Mutual Ins. Co. v. Utica National Ins. Group* (2013) 213 Cal.App.4th 1494, 1501.) If the trial court was wrong about whether a declaratory relief action was required to terminate the duty to defend, this was an abuse of discretion.

3. Analysis

The duty to indemnify runs to claims that are actually covered, while the duty to defend "runs to claims that are merely

9

potentially covered." (*Buss*, *supra*, 16 Cal.4th at p. 46.) "Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081.)

The duty to defend generally lasts "until the third party litigation ends, unless the insurer sooner proves, by facts subsequently developed, that the potential for coverage which previously appeared cannot possibly materialize, or no longer exists." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 657 (*Scottsdale I*).) "Normally, the insurer must defend until the underlying action is resolved by settlement or judgment. However, circumstances may change such that there is no longer a potential for coverage by, for example, (1) the discovery of new or additional evidence, (2) a narrowing or partial resolution of claims in the underlying action, or (3) the exhaustion of the policy. [Citations.] When any such circumstances exist, an insurer may bring a declaratory relief action, in order to conclusively establish that there is no longer a duty to defend." (*Great American Ins. Co. v. Superior Court* (2009) 178 Cal.App.4th 221, 234–235, fn. omitted.)

But although it is typical for an insurer to seek a judicial declaration that it has no duty to defend, "there is no particular requirement that an insurer ask the permission of a trial court before withdrawing from a defense, once the insurer has determined that no potential for indemnification liability exists.

10

Although—in order to avoid any possibility of liability for bad faith—it may be *prudent* for an insurer to obtain a declaratory judgment that it has no defense duty before unilaterally withdrawing from a defense, it is not required to do so." (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1192 (*Ringler*); see also *Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 320, 327, fn. 4 (*Minkler*) [duty to defend may terminate if an insurer's investigation shows an exclusion applies].)

In this case, the parties stipulated that as of certain dates, in certain lawsuits, gun plastic cement was identified as the exclusive CalPortland Company product that allegedly caused the underlying plaintiff's injury. This fact had the effect of triggering the gun plastic exclusion in Continental's policy as of the date specified and was binding as to the parties. (*Bechtel Corp. v. Superior Court* (1973) 33 Cal.App.3d 405, 411–412 [stipulation in proper form is binding upon the parties].)

Although Continental *could* have brought a declaratory relief action or a motion for summary judgment on these dates for the purpose of obtaining a ruling that it had no duty to defend, it was not required to do so if in fact there was no coverage. (*Ringler, supra,* 80 Cal.App.4th at p. 1192.) By stipulating to the facts necessary to trigger the exclusion as of a specified date, the parties obviated the need for any type of judicial declaration on this issue. Contrary to the suggestions in the nonbinding federal authorities cited by the trial court in its statement of decision (*Travelers Indem. of Illinois v. Ins. Co. of N. America* (S.D. Cal.

11

1995) 886 F.Supp. 1520, 1527; *Twin Star Ventures, Inc. v. Universal Underwriters Insurance Company* (N.D. Cal., Mar. 18, 2014, No. 10-4284 MMC) 2014 WL 1092842, at *2), declaratory relief or summary judgment was not required. (*Ringler*, *supra*, 80 Cal.App.4th at p. 1192.)

National Union acknowledged at the last phase of the trial that *if* Continental had been defending CalPortland it would have been entitled to stop doing so when gun plastic was identified as the sole CalPortland product at issue, but it argued that since Continental had not been defending, it was not entitled to rely on the gun plastic exclusion. We disagree. Continental would not be entitled to retroactively claim that it had no duty to contribute to defense costs incurred *before* gun plastic was determined to be the only CalPortland product at issue, because before the date that gun plastic was identified, there was still a potential for coverage and a duty to defend. (*Buss*, *supra*, 16 Cal.4th at p. 46; *Scottsdale I, supra*, 36 Cal.4th at p. 657; *Fireman's Fund Insurance Co. v. Chasson* (1962) 207 Cal.App.2d 801, 807.) But it was relieved of the duty to defend as of the dates specified in the stipulation, and is not liable for defense costs beyond that date. (*Ibid*.) National Union cites no controlling California authority to support its suggestion that by failing to defend, Continental was estopped from asserting the gun plastic exclusion, even when the parties agreed to the facts giving rise to the exclusion. (See *Safeco Ins. Co. of America v. Superior Court* (2006) 140 Cal.App.4th 874, 879–881 [in an equitable contribution action,

nonparticipating insurer may raise coverage defenses as affirmative defenses although it has burden of proof in doing so].)

We emphasize that this is an action for contribution among insurers. Whatever duties an insurer might owe the insured before attempting to withdraw from an ongoing defense after discovering there is no coverage, the equities of this case are considerably different. There is no reason not to bind the parties to their stipulation regarding gun plastic.

B. *Effect of Retrospective Premiums*

The Continental policy contains a retrospective premium endorsement under which the premium would be calculated based on losses actually incurred. The amount of the premium that could be billed included actual defense and indemnity costs, up to a maximum of $250,000 per occurrence plus taxes and fees, and was subject to a maximum of 1.4 times the standard premium, of which about $1.3 million remained at the time of trial. Continental argues it cannot be required to pay equitable contribution for costs within this amount, because to do so would effectively require the insured to contribute to its own defense. We reject the claim.

Continental relies primarily on *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 71–73 (*Aerojet*). There, the insured was covered by a number of policies, including one "fronting" policy in which the insured assumed all

13

responsibility for payment of defense costs and indemnity.[7] (*Id.* at pp. 69–70.) In such a situation, the court held, an insured could not be required to contribute in an action for equitable indemnity because only insurance companies could be held liable for equitable indemnity and contribution. (*Id.* at pp. 71–73.) "Although insurers may be required to make an equitable contribution to defense costs *among themselves*, that is all: An insured is not required to make such a contribution *together with insurers*" when a fronting policy is involved. (*Id.* at p. 72.) *Aerojet* recognized that fronting policies were a form of self-insurance, which is really not insurance at all. (*Ibid.*, fn. 20.)

Continental argues the retrospective premium in this case was also a form of self-insurance and is indistinguishable from the fronting policy in *Aerojet*; consequently, awarding equitable indemnity for any amount for which it was entitled to seek retrospective premiums from CalPortland is the same thing as ordering equitable indemnity against an insured. We disagree. Although retrospective premiums might be broadly characterized

---

[7] "Fronting policies. . . guarantee [] the claims of injured third parties with the insured being liable to the fronting insurer for reimbursement of anything it might pay out by way of both indemnification and defense." (*Padilla Construction Co., Inc. v. Transportation Ins. Co.* (2007) 150 Cal.App.4th 984, 1001, fn. 17.) A " 'fronting policy' " is "a policy which does not indemnify the insured but which is issued to satisfy financial responsible laws of various states by guaranteeing to third persons who are injured that their claims . . . will be paid." (*Columbia Casualty Co. v. Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 471.)

as a form of self-insurance in some contexts, the right to collect retrospective premiums from CalPortland[8] did not obviate Continental's duty to defend and indemnify in the first instance. The Continental policy did in fact transfer risk from the insured to the insurer, even if the insurer could subsequently bill the insured additional premiums to make up the cost of claims actually made. (See *Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677, 694 [self-insured retention by which insured agreed to bear certain amount of loss before coverage would arise under policy did not limit insurer's duty to defend].) In *Aerojet*, by contrast, the fronting policy placed the obligation to pay defense and indemnity costs on the insured. (*Aerojet*, *supra*, 17 Cal.4th at p. 71.)

Moreover, in *Aerojet*, the insurance companies were directly seeking contribution for defense costs from an *insured* based on its obligations under a fronting policy. (*Aerojet*, *supr*a, 17 Cal.4th at pp. 71–72.) Here, National Union is seeking contribution not from the insured, but from Continental, which, the court found, "has exactly the same defense obligations as the other insurers." The point of *Aerojet* is that an insured is not a proper party to an action for equitable contribution because it is not an insurer even when it has some variety of self-insurance. (*Ibid*.) Although *Aerojet* forbids a contribution action directly against an insured, even when it is self-insured through a fronting policy, it does not

---

[8] We do not need to decide whether the trial court was correct that only CalMat, rather than CalPortland, was responsible for the retrospective premiums.

15

insulate an insurer from paying its share of defense costs in claims it is obligated to defend.

Continental relies on two federal district court opinions which stand for the proposition that an order against an insurer in an equitable contribution action may not allocate costs in such a way that liability is imposed on the insured. (*Detrex Chem. Indust., Inc. v. Employers Ins.* (N.D. Ohio 1990) 746 F.Supp. 1310, 1325; *Air Prods. & Chems., Inc. v. Hartford Acc. & Indem. Co.* (E.D. Pa. 1989) 707 F.Supp. 762, 770–771, aff'd. in part & vacated in part (3d Cir. 1994) 25 F.3d 177.) But under *Aerojet*, what is forbidden is not the imposition of any liability upon the insured, but the application of equitable indemnity principles to an insured. Any attempt by Continental to recover the retrospective premium would be based on the contract between Continental and CalPortland, not on principles of equitable contribution. Nothing in that decision precludes an insurer from seeking to directly recover from its insured under the insurance contract. Should Continental seek to recover its retrospective premium from CalPortland (or an affiliated entity) there might well be defenses to that effort—but that is not before us.[9]

C. *Motion to Preclude National Union from Abandoning Indemnity Claim*

National Union sought reimbursement for past defense costs but did not seek past indemnity costs from Continental or Mid-Century. Before the final phase of the trial, Continental

---

[9] The evidence suggests that CalPortland has opposed paying the retrospective premiums.

16

filed a motion asking the court to preclude National Union from "abandoning" its past indemnity claims. It argued that allowing CalPortland to forego a claim for past indemnity would change the nature of the action and be inequitable to Continental. The court denied this motion in its statement of decision, concluding "Continental cannot compel National Union to pursue a claim it does not wish to pursue, and as to which it has given timely notice it will not pursue." The court noted that National Union had advised the parties as early as 2015 (three years before the final phase of trial) that it would not pursue a claim for past indemnity, and indeed, it indicated in an interrogatory response that it was not presently aware of past indemnity costs for which it sought reimbursement.

While it may at first blush appear unusual that a party will complain when its opponent elects not to pursue a claim against it, Continental's reason for doing so here is apparent. Continental's policy had a $1 million aggregate limit exclusive of defense costs. When Continental reached the $1 million aggregate amount through indemnity payments, it would cease to have any further liability to defend or indemnify under the policy: "[Continental] shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of [Continental]'s liability has been exhausted by payment of judgments or settlements." Thus, by not pursuing a claim for past indemnity, which might have caused the aggregate limit to

17

exhaust, National Union stretched out the time that Continental would be liable to contribute defense costs.[10]

Continental cites no authority for the proposition that the court could compel National Union to bring a claim for past indemnity. True, the decision not to seek past indemnity appears to have prolonged the time that Continental would remain liable for defense costs. But this does not mean the court had the power to control what was apparently a strategic decision on the part of National Union. Continental could have avoided this result by contributing to the defense all along, which would have entitled it to intervene in the various settlements, possibly exhausting its policy limits. (See *United Service Automobile Assn. v. Alaska Ins. Co.* (2001) 94 Cal.App.4th 638, 644.)

Continental argues that National Union's decision to forego a claim for contribution of past indemnity costs effectively meant there was no possibility of coverage for those costs under the policy. It argues that if there was no possibility of coverage, there was no duty of defense, and it could not be required to contribute to defense costs when contribution for indemnity was not sought. We disagree. Whether there was a potential for coverage is a different question than whether contribution for indemnity will be sought. One does not depend on the other and Continental cites no law to the contrary.

---

[10] Continental entered the final phase of the trial having already contributed $835,422 toward the settlement of CalPortland's liabilities, leaving only $164,578 of the aggregate amount that it could be required to pay for indemnity costs.

18

D. *Prejudgment Interest*

Continental argues the court erred by including mandatory prejudgment interest in the judgment. Having reviewed the claim independently (*Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 296), we disagree.

Civil Code section 3287, subdivision (a), provides for the recovery of mandatory prejudgment interest when damages are "certain, or capable of being made certain by calculation." The primary purpose of this provision " 'is to provide just compensation to the injured party for loss of use of the [underlying] award during the prejudgment period—in other words, to make the plaintiff whole as of the date of the injury.' " (*Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 643.)

Under Civil Code section 3287, prejudgment interest is allowable where the amount due plaintiff is fixed by the terms of a contract. " 'If damages are "certain," interest must be awarded as a matter of right.' " (*State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1038 (*Continental II*).) Courts generally apply a liberal construction in determining whether a claim is certain. (*Ibid.*)

Like the trial court, we are guided by *Continental II*, in which a mandatory award of prejudgment interest was affirmed in an action by the state seeking to recover costs from several of its insurers for cleanup of a hazardous waste site despite there being many unknowns at the time before judgment. (*Continental II, supra*, 15 Cal.App.5th at pp. 1038–1039.) The court noted that

19

in insurance cases, "what has been treated as controlling is whether the uncertainty is legal or factual." (*Id*. at p. 1039.) "What is critical is not whether the defendant *actually* knows how much it should pay; rather it is whether the defendant *could have* calculated how much it should pay, *if* it had known how the court would ultimately rule on the legal issues." (*Id. a*t p. 1043; see also *Hartford Accident & Indemnity Co. v. Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285, 1290–1296, 1307 [prejudgment interest proper in contribution action where amount of damages are not contingent and only the order of the policies' priority was uncertain]; *Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1172–1174; *Shell Oil Co. v. Nat'l Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633, 1651.)

In this case, the award of damages was based on past defense costs, whose amount was undisputed. Although it was not clear going into this action exactly how these defense costs would be allocated, the only dispute was of a legal, not factual nature. If Continental had known how the court would ultimately rule, it could have calculated its liability as the only issue was what portion it should pay of the defense costs, and not the amount of those costs. (*Continental*, *supra* 15 Cal.App.5th at p. 1043.) Mandatory prejudgment interest was appropriate.

The decision in *St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mutual Ins. Co.* (2012) 210 Cal.App.4th 645, 665–666 (*St. Paul*), on which Continental relies, does not require a different result. There, the court reversed an award of prejudgment interest against a subcontractor's insurer in an

20

action by the general contractor's insurer for equitable contribution. The underlying action involved construction defect litigation and there were factual questions pertaining to the subcontractor's work that were relevant in assessing whether the subcontractor's insurer was obligated to defend and indemnify the general contractor as an additional named insured, and whether it should therefore contribute to amounts paid by the general contractor's insurer. (*Id.* at pp. 652–665.) Although the amount of the settlement with the injured parties was not in dispute, the subcontractor's level of fault was, and this created a factual issue which rendered the amount of damages uncertain and precluded an award of prejudgment interest. *Continental II* distinguished *St. Paul* on this basis and found that it did not preclude an award of prejudgment interest when the measure of damages turns exclusively on legal issues. (*Continental II*, *supra*, 15 Cal.App.5th at p. 1041.)

### iii. *Mid-Century's Appeal*

#### A. *Aggregate Limit*

An "aggregate" limit on coverage is the total limit that applies regardless of the number of claims submitted for the policy period. (See *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.* (1993) 5 Cal.4th 854, 861–862.) The trial court rejected Mid-Century's argument that its policies contained such a limit, which had been reached by the time it stopped contributing to CalPortland's defense in 2012. The court determined that the Mid-Century policy did not on its face contain an aggregate limit, and instead contained language

21

clearly stating that there was no limit on the number of accidents for which claims could be made. It declined to consider extrinsic evidence suggesting the parties understood the Mid-Century policies to contain aggregate limits when such an interpretation was contrary to the plain language of the policy. The trial court did not err.

The Truck policies over which the Mid-Century policies sat as excess insurance contained aggregate limits equal to the per occurrence limit of $100,000 or $300,000. The Mid-Century policies contain an endorsement entitled "SINGLE LIMIT AGGREGATE EXCESS INSURANCE ENDORSEMENT," which indicates that Mid-Century would insure against bodily injury and property damage as insured by the applicable policy "issued by Truck Insurance Exchange, hereinafter called Primary Insurer." Despite the reference to "AGGREGATE EXCESS INSURANCE" in its title, the endorsement states no aggregate limit and instead provides, "It is agreed that [Mid-Century] shall be liable only for the excess of loss over $300,000 [or $100,000] for each and every accident or series of accidents arising out of one occurrence, and then only up to $200,000 [or $400,000] of excess for such accident or occurrence, *it being understood, however, that there is no limit to the number of accidents for which claims may be made hereunder, provided such accidents occur during the currency of this policy period*." (Italics added.)

The interpretation of an insurance policy begins with the language of the policy. (*Minkler*, *supra*, 49 Cal.4th at p. 321.) The policy language here ("there is no limit to the number of

22

accidents for which claims can be made hereunder") unambiguously meant there was no aggregate limit so long as the amount Mid-Century paid on each loss was no greater than $200,000 [or $400,000]. The cryptic reference to "AGGREGATE EXCESS INSURANCE" in the title of the endorsement was not itself an operative term of the policy and did not purport to set any aggregate limit on the claims to be paid. (See *Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 965.)

Mid-Century argues that it should have been allowed to present extrinsic evidence to show that the parties to the policy intended an aggregate limit to apply (including course of conduct and certificates of insurance identifying the types of policies issued).[11] We are not persuaded. We are mindful of the rule that "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic [parol] evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351.) But the key words here are "reasonably susceptible." Extrinsic evidence is not admissible "to flatly contradict the express terms of the agreement." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1167; see also *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 987 ["the use of parol evidence is always subject to the limitation that parol

---

[11] A certificate of insurance is merely evidence that a policy has been issued, but it is not an insurance contract and does not "amend, extend or alter the coverage afforded by the policies listed." (Ins. Code, § 384, subd. (a).)

23

evidence may not be used to vary or contradict the words the parties agreed upon"].)

" 'An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing.' " (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1357; accord, *Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 722.) "Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19.) Here, the language of the contract was not ambiguous; it expressly provided "there is no limit to the number of accidents for which claims can be made hereunder." Any extrinsic evidence regarding the intent of the parties would not be offered to show that the words of the contract should be interpreted in a particular way, but rather, to contradict them entirely. As the trial court properly found, the extrinsic evidence was not admissible.

Mid-Century posits that its policies should be viewed as extensions of the primary Truck policies with a combined aggregate limit equal to the amount of the total coverage ($500,000). Hence, once Truck had dropped out because its $300,000 (or $100,000) aggregate limit had been reached, Mid-Century would step in until the $500,000 combined aggregate had been reached, at which point Mid-Century would also exhaust and CalPortland would be entitled to a defense from a carrier which provided coverage that was excess to Truck's and Mid-Century's $500,000 in coverage and would kick in only if

that amount were met.[12]  Mid-Century notes that if its policies are interpreted as having no aggregate limits, there would be a "gap" in coverage, because it was not obligated to indemnify CalPortland unless the $300,000 (or $100,000) limit for primary coverage had been met, and if Truck reached its aggregate limit and exhausted, the insured would be obligated to fill this gap as a retention amount.[13]  Mid-Century argues that the policy above it would not be triggered (and CalPortland would not have the full benefit of the insurance it had paid for) unless a claim was great enough to satisfy both the retention amount and the amount Mid-Century was obligated to pay (which totals $500,000).

The language in the policies at issue was drafted before the extent of the asbestos claims was known.  The interpretation of the policy now offered by Mid-Century may well be what its underwriting department would have offered to CalPortland if the policy were written today.  But we are asked here to

_____

[12] One of the insurers that was excess to Mid-Century is Mission Insurance, which is not a party to this lawsuit.  It is unclear whether that insurer is still solvent.  (See *Garamendi v. Mission Ins. Co.* (2005) 131 Cal.App.4th 30, 33 [noting Mission's insolvency].)

[13] " 'The term "retention" (or "retained limit") refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy.  It is often referred to as a "self-insured retention" or "SIR." ' " (*Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466, 1474.)  It differs from a deductible in that it obligates the insured to pay defense costs as well as indemnity.  (*Ibid.*)  We note the trial court's final allocation requires Mid-Century to pay future indemnity costs only when the retention amount has been met.

determine whether the Mid-Century policies *as written* contain aggregate limits. Elegant though it might appear, the interpretation of the policy advocated by Mid-Century is contrary to its language with respect to this point. "If contractual language is clear and explicit, it governs." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) It is " ' axiomatic that an insurance policy is but a contract and that like all other contracts, it must be construed from the language used; where, as here, its terms are plain and unambiguous, the courts have a duty to enforce the contract as agreed upon by the parties.' " (*Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 656.)

Mid-Century argues that a number of policies which provided coverage excess to its own referred to the combined Truck/Mid-Century policies as having a combined aggregate limit of $500,000, and it argues that the court should have admitted this as extrinsic evidence showing that the Mid-Century policies did in fact have aggregate limits. Mid-Century cites the recent decision in *Gull Industries, Inc. v. Granite State Ins. Co.* (Aug. 23, 2021, 78277-1-I) __ P.3d ___ [2021 WL 3720967 *10], which in turn relies on *SantaFe Braun, Inc. v. Ins. Co. of North America* (2020) 52 Cal.App.5th 19, 25–27 (*SantaFe*), and *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, for the proposition that "excess policies above Mid-Century are relevant/admissible to the details/interpretation of Mid-Century's policies and limits."

The new authorities cited by Mid-Century concern whether excess insurance policies were triggered only when there has been exhaustion of all underlying layers of insurance (horizontal exhaustion) rather than exhaustion only of those underlying policies specified in each overlying policy (vertical exhaustion). (See *SantaFe*, *supra*, 52 Cal.App.5th at p. 21, 29.) While it might be necessary to look outside an excess policy and into a different layer of coverage to answer that question, this does not mean that we are free to interpret a policy that does not have aggregate limits as having them simply because a policy excess to that one says it is so.

B. *Statute of Limitations*

Mid-Century argues that National Union's claim against it for equitable contribution was barred by the statute of limitations. Because the relevant facts are not in dispute, we review the claim de novo. (*Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, 713–714.)

The statute of limitations in an equitable contribution action by one insurer against another is two years under Code of Civil Procedure section 339, subdivision (1) as "[a]n 'action upon a contract, obligation or liability not founded upon an instrument in writing.' " (*Century Indemnity Co. v. Superior Court* (1996) 50 Cal.App.4th 1115, 1117, 1119, fn.4; but see *Liberty Mutual Ins. Co. v. Colonial Ins. Co.* (1970) 8 Cal.App.3d 427, 432 [statute of limitations is four-year period for "action upon any contract, *obligation* or liability *founded upon an instrument in writing*"].) Although a cause of action for equitable contribution first *accrues*

when the nonparticipating insurer first refuses to participate in the defense of a common insured, it is *tolled* until the plaintiff insurer makes the last payment in the suit for which it seeks contribution. (*Underwriters of Interest Subscribing to Policy Number A15274001 v. ProBuilders Specialty Insurance Co.* (2015) 241 Cal.App.4th 721, 735–736.)

Even though Mid-Century claimed exhaustion of its policies and refused to contribute to CalPortland's defense in July 2012, it was not until November 2012 that National Union made a payment for which it seeks contribution. National Union filed this action on August 5, 2014, within two years after making this payment. This action is not time barred.

C. *Duty to Defend*

In its decision following Phase II of the trial, the trial court found that Mid-Century had a duty to defend CalPortland that commenced when the Truck policies exhausted. Mid-Century argues it did not have a duty to defend under its policy, but only a duty to reimburse in proportion to its indemnity payments. It suggests that it had no obligation to pay an allocation of the defense costs unless and until there was a final determination of liability. We disagree.

The trial court properly concluded that the operative Endorsement in the Mid-Century policy incorporated Truck's duty of defense by providing, "It is understood and agreed that this Excess Insurance is subject to the same representations, terms and conditions (except as regards the premium, the amount and limit of liability, and the renewal agreement, if any,

28

and except as otherwise provided in this policy and endorsement), as are contained in, or any amendment to, the above policy of the Primary Insurer." The "terms" or "conditions" included Truck's obligation, set forth in its policies, "to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent."

Although the general policy form or jacket of the Mid-Century policy provides it was "subject to the same warranties, terms, and conditions (except as regards the premium, *the obligation to investigate and defend*, the amounts and limit of liability and the renewal agreement, it any)" (italics added), this language does *not* expressly disavow a duty to defend. (Cf. *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1199, disapproved on other grounds in *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 201 (*Continental I*).) At most, it states that it does not incorporate the defense obligations of the Truck policy. (*Aetna Cas. & Sur. Co. v. Certain Underwriters* (1976) 56 Cal.App.3d 791, 800–801 (*Aetna*) [similar language indicates only that the duty to defend is "unlike that of the primary insurer" and does not expressly declare with certainty that there is no obligation to defend].) And to the extent the language in the general policy form conflicts with the endorsement, " 'the endorsement controls.' " (*Aerojet*, *supra*, 17 Cal.4th at p. 50, fn. 4, citing *Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 431.)

In support of its argument that it had a duty to contribute to defense costs after the fact but not a duty to defend, Mid-Century relies on language in the general policy form or jacket in a section entitled "Apportionment of Costs" that when a claim is adjusted for the amount that exceeds the limits of the primary policy, Mid-Century must "contribute" to costs incurred by or on behalf of the insured "in the ratio that is its proportion of the ultimate net loss." This does not take precedence over the Endorsement's language incorporating a duty to defend and, in any event, does not expressly disavow a duty to defend. (*Aetna, supra*, 56 Cal.App.3d at pp. 800–801.) Rather, it clarifies Mid-Century's duty as an excess carrier to contribute its pro rata share of costs only when the amount of primary coverage has been exceeded (in cases where presumably Truck would be defending).

D. *Abuse of Discretion in Using Time-on-the-Risk Allocation of Costs*

Mid-Century argues the trial court erred in allocating costs based on a "time on the risk" formulation rather than requiring all three insurers to contribute equal shares. We review the claim for abuse of discretion and find none. (*Centennial Ins. Co. v. United States Fire Ins. Co.* (2001) 88 Cal.App.4th 105, 112 (*Centennial*).) As the trial court noted, "California law makes clear that time-on-the-risk allocation is 'the approach likely to lead to the fairest result in most cases.'" (*Stonewall, supra,* 46 Cal.App.4th at p. 1862.) It was also the allocation method

30

employed by the parties for splitting costs for many years, until the current dispute arose.

We reject Mid-Century's argument that the court should have required contribution based on equal shares because each of the primary policies (National Union's, Continental's, and Truck's)[14] has an "other insurance" provision stating that if there were multiple insurers, the company was not liable for a greater portion of indemnity than if each insurer contributed an equal share to the loss. As the trial court noted, the insurers did not have contracts with each other and the right of contribution was an equitable one, not contractual. (*Centennial, supra,* 88 Cal.App.4th at pp. 115–116; *Axis, supra,* 204 Cal.App.4th pp. 1231–1232.) Additionally, the other insurance clauses apply only to indemnity, not defense costs, and are designed to ensure that the insured does not recover more than 100 percent of the indemnity due. (See also *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1079–1080 [modern trend is to ignore other insurance clauses and pro rate among the policies based on equitable considerations].)

Nor are we persuaded that Mid-Century's time-on-the-risk share must be calculated on the basis of only one of its policy years, rather then the nine years that it insured CalPortland. Mid-Century claims its policy had "anti-stacking" language which would have precluded CalPortland from ever recovering against

---

[14] Mid-Century's policy incorporates the terms and conditions of Truck's policies, with exceptions not relevant to this issue.

more than one of its policies for any given claim; consequently, it argues that it would be unfair to it to allocate costs as though the coverage under all nine years of its policies could be potentially triggered.

Putting aside the trial court's conclusion that this issue was not timely raised, we would reject the claim on its merits. " 'Stacking policy limits means that when more than one policy is triggered by an occurrence, each policy can be called upon to respond to the claim up to the full limits of the policy.' " (*Continental I*, *supra*, 55 Cal.4th at p. 202.)  In the context of a "long-tail" injury[15] such as exposure to asbestos, where the occurrence can trigger several difference different policies, stacking is permitted unless there is an explicit "anti-stacking" provision that limits liability to one of the policies in place during the continuing injury.  (*Id.* at pp. 195–196, 201; see *Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1216 [provision limiting coverage must be "conspicuous, plain and clear"].)  No such language appears in the Mid-Century policy.[16]

_____

[15] A "long-tail" injury "is characterized as a series of indivisible injuries attributable to continuing events without a single unambiguous 'cause.'  Long-tail injuries produce progressive damage that takes place slowly over years or even decades." (*Continental I*, *supra*, 55 Cal.4th at pp. 195–196.)

[16] The Endorsement provided, "It is agreed that [Mid-Century] shall be liable only for the excess of loss over $300,000 [or $100,000] for each and every accident or series of accidents arising out of one occurrence, and then only up to $200,000 [or $400,000] of excess for such accident or occurrence."  This language unambiguously established the per occurrence limits

Mid-Century also argues it should have received a set-off for amounts it paid on behalf of CalPortland prior to 2012. Although these pre-2012 claims would be barred by the two-year statute of limitations applicable to equitable contribution actions under Code of Civil Procedure section 339, subdivision (1), Code of Civil Procedure section 431.70 allows a set-off to be asserted notwithstanding the statute of limitations. As the trial court found, however, Mid-Century failed to raise this as an affirmative defense, and a claim for a setoff of a time-barred claim under section 431.70 must be raised as an affirmative defense in an answer to the complaint. (*Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 731.) This itself is a codification of the common law rule that "[a] setoff is generally a new matter which must be affirmatively pleaded." (*Ibid*.)

E. *Prejudgment Interest*

Mid-Century adopts Continental's challenge to prejudgment interest. We reject the claim for the reasons stated in section II(ii)(D) of this opinion.

III.   DISPOSITION

The judgment is reversed and the case is remanded for a recalculation of the parties' percentages of responsibility consistent with our discussion in section II(ii)(A). The judgment is otherwise affirmed. The parties shall bear their own costs in the appeal by Continental. (Cal. Rules of Court, rule 8.278(a)(3).)

---

under the policy for each policy period, and further established that the Mid-Century insurance was excess insurance, but did not clearly and conspicuously state that stacking was prohibited.

National Union shall recover its costs in the cross-appeal by Mid-Century. (*Id.*, (a)(1) & (a)(2).)

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BURNS, J.

_Nat. Union Fire Ins. Co. v. Mid-Century Ins. Co./_ A156889